UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Susan M. Kimbrough,                                    :        Case No. 1:12-cv-342
                                                       :
        Plaintiff,                                     :
vs.                                                    :
                                                       :
Cincinnati Association for the Blind and               :
Visually Impaired,                                     :
                                                       :
        Defendant.                                     :
                                                       :

## ORDER

        Before the Court is Defendant's motion for summary judgment.  (Doc. 28)

Plaintiff opposes the motion (Doc. 33), and Defendant has filed its reply.  (Doc. 46)

Susan Kimbrough worked for the Cincinnati Association for the Blind and Visually

Impaired ("CABVI") from 1985 until she was terminated in October 2010.  Her complaint

(Doc. 1) alleges that CABVI retaliated against her for engaging in conduct protected by

the Americans with Disabilities Act ("ADA"); discriminated against her based upon her

age; and violated Ohio public policy by terminating her for seeking the advice of a

lawyer.  Kimbrough has abandoned her federal and state law age discrimination claims,

but contends that her former employer is not entitled to summary judgment on her

retaliation and public policy claims.

        For the following reasons, the Court grants in part and denies in part Defendant's

motion for summary judgment.

## FACTUAL BACKGROUND

        Susan Kimbrough began her employment with CABVI in September 1985, as a

low vision services manager.  She has a Master of Science degree in vision rehabilitation, and began working for CABVI after obtaining that degree.  Her job duties expanded significantly over her years at CABVI; her immediate supervisor during the years of her employment was Virginia Backscheider, the Director of Program Services, who reported directly to CABVI's executive director.  The agency had three executive directors during her tenure: Carl Agusto, Hank Baud, and John Mitchell, who began in that position in 2006.  Mitchell started at CABVI in January 1999 as its Director of Auxiliary Operations.  As executive director, Mitchell has the ultimate authority for decisions regarding personnel and personnel discipline.  (Powell Dep. at 40; Mitchell Dep. at 16-17)

Kimbrough generally received favorable performance reviews throughout her years at CABVI, especially in areas of client service.  But there were also several incidents noted over the years concerning her workplace behavior, and her negative criticism of agency policies and directives, especially in group settings.  Her personnel file includes a memo from Hank Baud, documenting a meeting held on January 10, 1995 between Kimbrough, Baud, and Backscheider.  Baud's memo states that the meeting addressed "reoccurring incidents of negativism and inappropriate behavior by you as a supervisor and expressions of an attitude that is not in the best interest of [CABVI].  Baud noted the following points:

    A.  Your negative and non-supportive attitude is no longer acceptable.

    B.  General meetings are no longer to be used as a forum for your negativism. ...

    C.  Negative and non-supportive comments are not to be made in open areas of the building or in the presence of other staff. ...

      D.  Your role as a supervisor is intended to put you in a leadership role.
      This also means being supportive of the agency and its directions as well
      as being a positive role model for your staff and others in the agency.  I
      need you to function in this mode.

(Kimbrough Dep. Ex. J)  In her December 1995 performance review, Baud noted: "The

only area of difficulty this year involved her negative response to the new salary

administrative system, and her sometimes negative reaction to changes around her.

Sue has tried very hard this year to temper this, and to adjust her attitude.  I have heard

directly from other staff that this has improved this year.  I also had several complaints

from others that continued improvement is needed.  She will continue to strive towards

a more even tempered approach to situations and staff next year."  (Kimbrough Ex. K at

K00173)  She received an overall performance rating of 3.35 out of 4. (Id. at K00175)

        Kimbrough received an overall rating of 3.3 ("effective") in her January 2000

performance review; in the section titled "areas that need to be strengthened," the items

listed included "letting go of things that disturb her" and "control of anger."  (Kimbrough

Ex. L at K00126)   In May 2004, Hank Baud received a complaint from an assistant

director at a local nursing home that Kimbrough had been aggressive and rude with her;

the director told Baud that she "had never been treated like that before on the phone."

(Kimbrough Ex. P)  Baud had a meeting with Kimbrough, Backscheider, and Jen

Glassmeyer (CABVI's Director of Human Resources from approximately 2002 through

2008) on May 20, 2004 to address this complaint.  Notes of that meeting state that they

discussed that this wasn't "the first incident of her losing her temper.  It's happened

before with co-workers, clients, and others she works with outside of the agency.  How

is she going to fix this?  SK responded that she would be 'passive and complacent.'  HB

responded - that's not [an] acceptable solution. ... SK needs to be able to communicate even in difficult situations in a professional manner and without losing her temper.  SK agreed that she can get stressed out and frustrated, especially in unexpected situations or situations that she can't control."  (Id.)  Baud told Kimbrough that this type of behavior must stop.  The group agreed to meet again the following Monday, to allow Kimbrough time to develop a plan for addressing these problems.  Kimbrough agreed to the terms of a written performance improvement plan, which she signed on June 2, 2004.  This plan stated that Kimbrough "must improve [her] ability to communicate and react to challenges, especially in unanticipated and more stressful situations. ... Any further occurrence of a similar nature will result in disciplinary action, up to and including termination."  The plan set forth several steps that Kimbrough agreed to take to improve her response in stressful situations, and in learning to request assistance from her supervisor and from management in handling difficult situations.  (Kimbrough Ex. R)

Kimbrough's February 2005 performance appraisal commended her clinical services and her efforts on behalf of expanding agency services.  Her overall performance rating was that she met expectations.[1]  (Kimbrough Ex. T)  Her performance over the past year was described as "excellent," but noted that she "will continue to work on her communication with other agency staff and her comments, which at times can come across as negative."  (Id. at K00076)

In June 2005, another agency employee (Gottschlich) sent a memo to Jen Glassmeyer (now known as Jen DuBois), complaining about Kimbrough's behavior

---

[1] The former numerical rating system was replaced by a three-step rating, whether the employee's performance "unmet, met, or exceeded" expectations.

during a meeting with Gottschlich and Backscheider about business cards for agency staff.  Gottschlich's memo stated that Kimbrough was angry, used an angry tone of voice, and would not listen to what Gottschlich was trying to say.  After voicing several complaints about the issue, Kimbrough abruptly left the room.  Gottschlich also reported that members of her staff were afraid of Kimbrough due to previous encounters involving yelling and "bullying behavior."  (Kimbrough Ex. U)  Backscheider's own written account of this meeting with Gottschlich and Kimbrough described the problem that had arisen about the business cards, and the discussion that preceded Kimbrough's abrupt departure.  Backscheider agreed that Kimbrough got very angry, and they met later that week to discuss "her outburst."  Backscheider told her it was not appropriate or professional for her to walk out on a meeting with agency staff, and told her not to do it again.  (Kimbrough Ex. V)  This incident led to another meeting between Baud, DuBois, Backscheider and Kimbrough on August 8, 2005, to address what Baud described as a "reoccurrence of behaviors that cause a hostile work environment."  Baud noted that such an environment "will not be tolerated any longer!"  (Kimbrough Ex. W)  Kimbrough was told to take the day off (without being charged for leave) to develop a specific plan to resolve the issues caused by her unacceptable behavior.  Baud also warned her that he did not "intend to have any future meetings to discuss inappropriate behavior of a key manager."  (Id.)

Kimbrough wrote a memo to Baud the next day, acknowledging that her behavior was viewed as "negative and unacceptable.  I understand the seriousness of this issue.  While I have been making efforts to improve, I have not been successful enough in my attempts."  Kimbrough proposed that she would seek counseling to address depression,

stress and anger management.  She agreed to attend managerial training sessions on communication skills and dealing with workplace stress.  And she agreed to continue regular meetings with her supervisor and to accept monitoring of her behavior at staff meetings.  (Kimbrough Ex. X)

In Kimbrough's performance appraisal for the year 2005, completed in February 2006, Baud noted: "I am most pleased with your efforts to address and resolve the inter-personal issues.  It is a process and will need to be continued, but the effort and the outcome have been recognized and are commendable."  (Kimbrough Ex. Y)  Her review noted that she was working to maintain a more positive attitude under stress, and had made great strides in doing so.  (Id. at K00063)  And in her 2008 review (for which she received an overall rating of 3 out of 4), it was noted that she expects "high quality work, and at times can be demanding.  Others may view this negatively; Sue needs to continue to work on this aspect of her work."  One of Kimbrough's stated goals and objectives for the following year was to continue to monitor her behavior to have a more positive attitude when reacting to certain situations.  (Id. at K00041)  A similar comment was made in her 2009 evaluation, where it was noted that she "worked for much of the year on expressing herself in a positive manner, and her relationships with some other staff have been positive.  She does need to continue to work on how to handle frustrating situations between herself and others, especially in group settings." (Kimbrough Ex. AA, at K00031)

Brian Powell began work in March 2008 as CABVI's director of administration; he left the agency in August 2011 when he relocated to another state.   Powell testified that soon after he started with the agency, he attended his first quarterly staff meeting, and

was "surprised" by Kimbrough's "rather disrespectful manner" in which she asked questions of Mitchell about various agency issues.  Powell mentioned his impression to Mitchell after the meeting, and Mitchell responded, "Oh, that's nothing.  You should see her personnel file."  After this conversation, Powell reviewed her file and recalled seeing references to her unacceptable conduct, anger management, and professional counseling requirements.  (Powell Dep. at 88-91)

Scott DeHart began working for CABVI in August 2009, as a Human Resources Generalist; DeHart became the Human Resources Manager after Powell's departure.  DeHart recalled that shortly after he attended his first general staff meeting at CABVI, Powell described to him Powell's observations of Kimbrough's inappropriate questioning of Mitchell during similar meetings.  This conversation with Powell was the first time that DeHart heard of anyone having any problem with Kimbrough.  (DeHart Dep. at 55-56)

On March 8, 2010, Jeanne Horton, CABVI's accounting supervisor, wrote a memo to DeHart and Powell, complaining about an interaction with Kimbrough.  According to the memo, Kimbrough called another accounting employee asking about a client balance due; the employee told Kimbrough that the computer was unavailable because the department was running a closing report.  The employee reported that the phone line abruptly went dead, and so Horton called the number that had appeared on the screen to follow up on the caller's request.  Kimbrough answered the phone, and said that a client wanted to pay her bill.  Horton again explained that she could not access the computer to obtain that information, and Kimbrough responded in a "very hateful tone, stating 'Well, it's not very consumer friendly but we'll deal with it' and she slammed the phone down in [Horton's] ear."  Horton felt that Kimbrough was

disrespectful to her, and she did not appreciate the treatment.  Horton thought the
incident should be reported to Human Resources "because I think it goes against our
core values as well as common courtesy and professionalism."  (Kimbrough Ex. CC)
DeHart placed the memo in Kimbrough's personnel file per Powell's instruction.
(DeHart Dep. at 61-62)

One of Kimbrough's employees in the low vision group, Jody Shank, underwent
emergency heart surgery in December 2009.  She took FMLA leave from December
through March of 2010, and Mitchell approved Shank's request for extended medical
leave after her FMLA-protected leave time was exhausted.  Shank was preparing to
return to work in the spring; she testified that she wanted to come back to work even
though her cardiologist was telling her to wait, because extending her medical leave
would require her to exhaust her accumulated leave time which she did not want to do.
Her cardiologist  provided a written statement (on his prescription pad form) that she
could return to work without restrictions on May 4, 2010.  (Shank Dep. Ex. 8)  DeHart
sent a memo to Kimbrough and Backscheider on May 3, 2010 at 10:36 AM, telling them
that he had discussed Shank's situation with John Mitchell, who had approved her
return beginning May 4.  DeHart and Mitchell also discussed whether Shank could work
a reduced schedule, and DeHart stated that they lacked medical justification for Shank's
continued use of sick leave for that purpose.  DeHart said that Shank could use
vacation and personal time to work part-time if Kimbrough approved.  He reviewed the
status of Shank's leave balances, and recommended a method for her to account for
her absence during April.  He told Kimbrough that she was welcome to arrange leave in
an alternate manner and/or to submit revised leave forms to him as needed.  And he

invited Kimbrough to discuss any questions or concerns she may have about Shank's situation. (Kimbrough Ex. DD)

At 11:19 a.m., Backscheider responded to DeHart, stating that she knew from her own discussions with Shank that Shank's doctor thought it was a good idea for Shank to return on a reduced schedule, but that the doctor was leaving it up to Shank and CABVI to do "what was best for Shank and her stamina." Backscheider went on to state that if we are "really questioning her medical justification for a reduced schedule, and are wanting to restrict her from using her sick leave even if she is not feeling well, then I am asking that you call her doctor" to obtain another statement permitting Shank to return part-time. (Backscheider Ex. 18 at K00698) DeHart responded at 12:32 p.m. to address her concerns, stating:

> As you know, Jody's medical certification indicated her fitness to return to employment without restrictions on May 4, 2010, and John has approved for Jody to return at that time. Neither John, Brian, nor I object to Jody being allowed to use her vacation and/or personal leave to reduce her hours worked. I understand and fully appreciate Jody's desire to reacclimate herself to work slowly and thereby reduce her stress in this transition back to work, and I think that the use of her vacation and/or personal time will facilitate this goal. However, the continued use of sick time to accomplish Jody's desired reduction in work hours would be inconsistent with the agency's Sick Leave policy. I disagree with your assertion that we are 'questioning her medical justification for a reduced schedule.' Jody's doctor has provided us with no such medical justification.

DeHart told Backscheider that if Shank disagreed with her doctor, it was her responsibility to obtain a certification stating her restrictions; in that event, Mitchell might approve a further medical leave permitting her to use sick leave to work a reduced schedule. DeHart invited Backscheider to discuss the issue in further detail if she

wished.  (Powell Ex. 7)  Backscheider responded at 1:45 p.m., saying she would talk to

Shank about how she wanted to handle the situation, saying "We will wait to see what

she wants to do in relation to her leave time for April as well.  We hope to have this

determined by the end of the week.  We are trying to make this as stress free for her as

possible because we want her to successfully be able to return to work."  (Id.)

Kimbrough was copied on this entire email exchange, as were Powell and

Mitchell.  Just after Backscheider's last response to DeHart, Kimbrough sent her own

email to him (copying only Backscheider) and stating:

> Scott, please return to me all of Jody's leave slips for April
> and I will resubmit based on the new interpretations of leave.
> I find it very insensitive and unrealistic to state that there is
> no medical justification for use of sick leave for an employee
> who is still recovering from open heart surgery!  My
> understanding of what you had said was that CABVI
> required a doctor statement that Jody was 'fit to return to
> employment.'  We have that statement.  I do not recall being
> told that we would need a doctor's statement for reduced
> schedule.  Do I now need medical statements, HR and
> executive director approval for sick leave?  My interpretation
> of our procedures is that sick leave approval is at a
> supervisory level.

(Kimbrough Ex. EE)  DeHart forwarded these comments to Powell and Mitchell, stating

that they "were rather brash and unprofessional, although that is par of course I

suppose [sic]."  He believed that her comments required "corrective instruction.  This is

not routine sick time; it is modification of job performance for a one-month duration."

(Powell Ex. 8)  At 2:58 p.m. the same day, Kimbrough sent another email to DeHart,

Powell, and Mitchell, with a copy to Backscheider, asking if CABVI had a formal return-

to-work form.  Kimbrough believed that such a form would be helpful "to avoid some of

the issues we have had today."  She said there had been other situations in which

concerns about medical restrictions had arisen, and that a more specific form allowing a physician to explain any limitations an employee returning from medical leave may have would benefit the agency.  She closed by stating: "From my personal and professional experience, what a doctor happens to write on a prescription pad usually would not be considered good documentation of information."  (Kimbrough Ex. FF)

The next day, May 4, Mitchell met with Kimbrough and Backscheider to review Shank's situation.  Mitchell then sent an email to Powell and DeHart, telling them that in his meeting, he "... made it clear that what we have done is appropriate and that we have two options, either Jody provides a revised doctor's release that stipulates a reduced schedule to which we'll allow use of accrued sick leave or stay with the current release and have Jody use Annual/personal leave."  Mitchell thanked DeHart and Powell for their time "spent ensuring we are doing things correctly."  (Powell Ex. 11)

Shank apparently returned to work on May 4 but was not able to work an entire day.  On May 6, Kimbrough emailed DeHart, Powell and Mitchell, reporting that Shank's cardiologist had provided another statement that Shank needed to return to work at reduced hours beginning May 6, and asked them if the new statement was acceptable. The next day, May 7, DeHart responded to Kimbrough that the form was acceptable, and that Shank would need to submit another form from her physician when she was ready to return full-time.  (Kimbrough Ex. HH)   Shank returned to work part-time and resumed a full-time schedule the following month.

On May 10, DeHart called Kimbrough to discuss an unrelated incident, another employee's foot injury; he thanked Kimbrough for promptly reporting the accident. There was apparently some uncertainty about whether or not a worker's compensation

claim was or should have been filed after this incident, because their respective written notes of this conversation state that they discussed several issues about worker's compensation coverage and employee health coverage.  DeHart agreed to meet with the injured employee to be sure she was aware that a worker's compensation claim would be filed.  Later on that day, DeHart brought the WC claim form to Kimbrough for her signature, which led to another discussion between them about worker's compensation, sick leave, CABVI leave policy and procedures, and FMLA policies. DeHart mentioned Shank's leave during this discussion, and Kimbrough raised the prior week's email exchanges about Shank.

Kimbrough's notes of this meeting state that she told DeHart that she had "reacted" to DeHart's statement that there "was no medical justification" for Shank to take sick leave or work a reduced schedule.  DeHart assured her that he realized how serious Shank's illness was; Kimbrough "became emotional and asked if he really did understand how serious and how close [Shank's medical incident] was..."  (Kimbrough Ex. JJ at 2)  Their discussion continued with respect to sick leave, unpaid leave, FMLA leave, and the extent of any employee's job protections.  Kimbrough's notes admit that she was "very frustrated" by this encounter, and was upset by DeHart's references to terminating employees.  She admitted that she was angry and emotional and became defensive during the meeting, but stated that she did not "yell at him."  After DeHart left, she reported the incident to Backscheider, who told her that DeHart had already told Powell about the encounter, telling Powell that she had been angry and unprofessional. (Id. at 3)

Powell provided Backscheider with a copy of DeHart's own written summary of

his May 10 meeting with Kimbrough, which described the tone of the meeting in more heated terms than did Kimbrough's own notes.  (See Backscheider Ex. 22 at K00686) According to DeHart, Kimbrough asked him if employees had to submit FMLA paperwork in order to use sick leave; DeHart responded that a leave exceeding 3 days could qualify under the statute as a "serious health condition," and could include a need for intermittent or continuous leave, as was true in Shank's situation.  This exchange led to Kimbrough's revisiting the situation involving Shank, and Kimbrough questioned why CABVI required Shank to get her doctor's statement in order to use sick time.  DeHart reminded her that FMLA leave is job-protected leave, but once an employee exhausts protected leave, the agency would be legally entitled to terminate the employee if he or she could not return to work.  Kimbrough objected to that assertion, telling DeHart that Shank had "protection" in the fact that she had worked at CABVI for 30 years.  She also mentioned a low-vision client who lost her sight and whose company was trying to move her into a different position; DeHart told Kimbrough that the client's situation was not relevant to Shank's case, because someone who had lost their sight may be disabled under the ADA, but Shank was not disabled nor regarded as disabled.  Kimbrough again protested CABVI's insistence that Shank provide additional paperwork to "justify" her request to use sick leave; after additional comments back and forth, DeHart said that Kimbrough abruptly left his office.  DeHart emailed his description of the meeting to Powell, saying he felt that Kimbrough's "hostile behavior and comments were very disrespectful toward HR/Admin and toward John's authority to implement agency policy at his discretion.  Overall, I thought it was very inappropriate conduct for an employee, particularly a manager."  (Powell Ex. 15)

After he received DeHart's email, Powell met with Backscheider later that day; in a memo documenting their discussion, Powell confirmed that Mitchell knew about the incident. Powell stated that while Kimbrough claimed that she wanted to "clear the air" with DeHart, "it was the way that she went about it that failed. There was anger and seeming resentment in the tone, manner, and inflection of her delivery. As you know, this is an area where Sue has had longstanding issues; ... Does she need more coaching/counseling, more anger management therapy? ... I will defer to you and [Mitchell] on how you wish to document this incident and proceed, but Sue's continual acting-out is creating multi-departmental disruptions." (Backscheider Ex. 22 at K-00684) After discussing the incident with Mitchell and Backscheider, Powell recommended that Kimbrough be disciplined, and that she receive a final warning about her behavior.

DeHart drafted a document that was eventually presented to Kimbrough on June 10, entitled "Record of Progressive Counseling." (Kimbrough Ex. KK) The document reviewed events during Kimbrough's entire employment history that the written warning said reflected "an ongoing pattern of negative and hostile behavior." It began with the 1995 documentation (discussed above), and cited comments in several of her performance reviews. DeHart noted that her negativity and hostile behavior were most recently demonstrated in the May 3 email exchange regarding Shank's return to work, which DeHart called "brash and unprofessional." During the May 10 meeting with DeHart, Kimbrough became increasingly agitated and aggressive until she stood up and abruptly left his office. These incidents were "indicative of the adversarial posture that Sue has taken toward the standardized implementation of agency policy. Sue is

-14-

resistant to cooperating with Human Resources, which has led to increased disruption of interdepartmental communication and interaction."  (Kimbrough Ex. KK at K00014) Her conduct continued the pattern of behavior despite repeated coaching and counseling, and immediate corrective action was needed.  Kimbrough was required to act in a positive fashion and demonstrate genuine support of the agency and the Executive Director.  She must not promote a "negative, hostile culture" in her unit, and she must be professional and cooperation in all interactions.  Kimbrough was warned that "**Immediate and sustained improvement is mandatory.  Any single further episode or incident <u>will</u> result in the immediate termination of your employment at CABVI.**" (<u>Id</u>., emphasis in original).  Kimbrough wrote on the form that she did not feel comfortable making any comments in response at that time.  She testified that Backscheider had recommended that she "just listen" during the meeting, and she said very little.  (Kimbrough Dep. at 196)

There were apparently no additional documented incidents or complaints about Kimbrough until October 12, when CABVI was running a flu-shot clinic at the agency. There was a high turnout, and many people were standing in line waiting.  Kimbrough and Shank were standing in line together along the wall of the room, and DeHart and Powell were seated at a table helping people with their paperwork.  DeHart and Powell overheard Kimbrough engaged in what they later described as "generalized complaining;" then she said "It would be a hell of a lot more efficient if they had lined us up inside."  DeHart stood up and looked at her, telling Kimbrough "we are doing the best we can."  Kimbrough responded "I'm not being critical."  DeHart said she raised her

hands up in some fashion when making this comment, but Kimbrough denied doing so.

Powell reported the incident to Mitchell, describing Kimbrough's conduct as exhibiting an "entitled attitude" because she criticized "administration in front of direct reports and subordinates [and] used profanity." (Powell Dep. at 45)  Mitchell met with Powell, DeHart, and Backscheider the next day, and Powell recommended that Mitchell terminate Kimbrough for violating her final warning.  Backscheider asked Mitchell to meet with Kimbrough first before taking any further action, and Mitchell agreed to do so and give her a "final final written warning," so long as her responses and conduct were satisfactory.  (Mitchell Dep. Vol. 1 at 77-78)   Powell would not have recommended terminating Kimbrough solely for her conduct at the flu clinic absent the final written warning.  Mitchell, Powell, and Backscheider met with Kimbrough the morning of October 14, and Kimbrough acknowledged her comment was inappropriate and she apologized.  Mitchell told her that he had been ready to terminate her but he decided to give her another chance, essentially telling her "don't let this happen again." (Backscheider Dep. at 176)   Kimbrough testified that Mitchell told her that her termination had been discussed, but that he was not inclined to proceed based upon her improved behavior since the June warning.  (Kimbrough Dep. Vol. 1 at 227-228)

Shortly after this meeting ended, Kimbrough sent an email to Mitchell, stating: "I am requesting a copy of the document that Brian Powell submitted regarding the "incident" on Tuesday.  Thank you."  (Powell Ex. 20)   When Mitchell received this email, he went to Kimbrough's office and closed the door.  He told her that he was upset that she had not used a salutation in the email (such as "Dear John").  He was also upset that she had put the word "incident" in quotation marks.  Kimbrough believed Mitchell

-16-

was upset with her and her email, and she told him that she asked for the document because she "assumed that it would be entered into my personnel file and that I had been counseled to request copies of anything being placed in my personnel file." (Kimbrough Dep. at 236)  At some point during the conversation, Mitchell said "You just don't get it, do you?" (Id. at 232-235)  Mitchell again stated that he could fire her, and Kimbrough felt that he was threatening to do so.  She said something to the effect of, "if that's what's going to happen, then that's what you need - then that's what you will do." Mitchell testified that Kimbrough said "Then maybe you should fire me if that is where we're at."  Kimbrough admitted that Mitchell's version is close to what she actually said, but described herself as feeling very threatened.  (Id. at 237)  Mitchell left her office and told her he would get back to her.

Mitchell went to see Powell, who testified that Mitchell was visibly upset; Powell said "it was very clear that he was upset about her conduct and behavior towards him, which was very insubordinate."  (Powell Dep. at 66)  They talked about the way that Kimbrough had responded to Mitchell, "... the way she threw down the gauntlet to challenge him to terminate her, and he felt it was completely insubordinate.  And I agreed with him."  (Id. at 68)  Mitchell decided to proceed with Kimbrough's termination. He called Backscheider (who had left the building to get lunch) and asked her to return. She went to Mitchell's office, and he told her about going to Kimbrough's office after she asked for the Powell document; Mitchell told Backscheider that he had asked Kimbrough if she understood that he could have terminated her, and she said something like "well, then fire me.  And [John] left [Kimbrough's office].  He was angry. ... He said Sue doesn't get it.  And something to the effect of, we're done."

-17-

(Backscheider Dep. at 177-178)

About an hour later, Kimbrough was summoned to Mitchell's office; Powell and Backscheider were there when she arrived. Mitchell told Kimbrough she was being terminated, and handed her a written termination notice. (Kimbrough Ex. MM) The notice described the incident at the flu shot clinic as a serious violation of her June 10 final warning. Kimbrough signed the termination form but wrote that she disagreed with the decision, and with the document's description of her employment history.

A few days later, on October 18, Mitchell forwarded to Powell a copy of Kimbrough's October 14 email (asking him for Powell's writeup of the flu shot clinic incident). Mitchell told Powell that he had received that email about 15 minutes after the October 14 counseling session in which he decided to give Kimbrough one more chance. Mitchell told Powell:

> The following email, with Sue putting the word incident in quotation marks, gave me the impression that Sue was questioning our meeting that had just concluded. I was very concerned given the very direct discussion that I had with Sue on her need for change. After discussing this email with you and Ginny, I went to Sue's office to discuss the email and her request. In the discussion, Sue informed me that she wanted a copy to share with her counsel and that she was entitled to have a copy of anything that is put in her personnel file. I informed Sue that her recent negative behavior in light of her counseling session and final warning in June 2010 along with her repeated, numerous documented incidents would allow me to fire her immediately with cause. Her response to me was "then maybe you should fire me if that is where we are at." At that point I told Sue that I would be back to her and left her office.

(Powell Ex. 20) Backscheider testified that Mitchell did not tell her about Kimbrough's email or speak with her about it before the final meeting in which Kimbrough was

-18-

terminated.  Powell said he learned about the email and final confrontation between Mitchell and Kimbrough after it happened, when Mitchell came to his office, and not before.  (Powell Dep. at 63)

Kimbrough filed a charge with the EEOC, claiming she was terminated based upon her age and in retaliation for her complaint about CABVI's failure to accommodate an employee's disability under the ADA.  (Kimbrough Ex. NN)   She then filed her complaint in this case on April 30, 2012, alleging retaliation under the ADA and Ohio law (Counts 1 and 2); age discrimination under the ADEA and Ohio law (Counts 3 and 4); and an Ohio public policy-wrongful discharge claim (Count 5).  In Count 5, she alleges that Mitchell terminated her after she told him that she had consulted a lawyer, who advised her to obtain a copy of Powell's written memorandum regarding the flu shot clinic incident.

CABVI seeks summary judgment on all of Kimbrough's claims.  Kimbrough does not contest the dismissal of her age discrimination claims, but argues that genuine factual disputes preclude entry of judgment on her retaliation and public policy claims.

**ANALYSIS**

I.    Summary Judgment Standards.

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his

pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

II.    ADA Retaliation Claims.

The ADA prohibits retaliation based on opposition to practices that are unlawful

-20-

under the Act, or conduct that otherwise seeks to enforce rights protected by the Act. Retaliation claims based on indirect evidence are analyzed under the <u>McDonnell-Douglas</u> burden-shifting rubric.  A prima facie case of ADA retaliation requires Kimbrough to establish that: (1) she engaged in activity protected under the Act; (2) CABVI knew of her protected activity; (3) CABVI took an adverse action against her; and (4) there is a causal connection between her protected activity and the adverse action.  <u>A.C. v. Shelby County Bd. of Educ.</u>, 711 F.3d 687, 696-697 (6th Cir. 2013).  If a prima facie case is established (and the burden of doing so is not an onerous one), CABVI must show that it had a legitimate, non-discriminatory/non-retaliatory reason for taking the adverse action.  If it does, the burden shifts back to Kimbrough to show by a preponderance of the evidence that the proffered reason is a pretext for unlawful retaliation.  The same standards apply to Kimbrough's state law retaliation claim, and they are discussed together.

CABVI contends that Kimbrough cannot establish a prima facie claim of retaliation because she did not engage in ADA-protected activity.  That is, she did not oppose any act she believed to be unlawful under that statute, or make a charge under or participate in any ADA-related investigation or proceeding.  CABVI contends that Kimbrough objected to DeHart's interpretation and enforcement of internal agency policies regarding the use of sick leave and vacation time for an employee returning from an approved medical leave.  Moreover, even if Kimbrough's complaints about Shank could be construed as complaints that CABVI was violating the ADA, CABVI argues that she has no evidence of a causal connection between the May incidents involving Shank and Kimbrough's October termination.  CABVI notes that this gap of

some five months is insufficient to prove causation.

Kimbrough argues that she opposed DeHart's failure "to engage in the interactive process required by the ADA when an employee requests an accommodation." (Doc. 33 at 23)  She argues that Shank sought an "accommodation" for her "disability" when she expressed a desire to return to work part-time for a month.  Kimbrough contends that DeHart refused to consider whether Shank was "disabled" and that she protested DeHart's refusal to do so.  But Kimbrough's own notes of her May 10 meeting with DeHart reflect that the only mention of "disability" came from DeHart, after Kimbrough described a situation involving a client.  DeHart's notes state that he "... clarified that this client's situation was not relevant to Jody Shank.  I explained that the situation Sue was referencing potentially involved a reasonable accommodation for a person who may be disabled under the ADA.  I explained that Jody had not been, nor was she currently regarded as a disabled individual by CABVI.  Jody's situation was an issue of her FMLA entitlement and the application of agency leave policies." (Powell Ex. 15)  Kimbrough's own notes agree with DeHart's description of this exchange.  And in her notes, she admitted that DeHart's explanation of a potential ADA accommodation versus Shank's desire for another month of medical leave on a part-time basis "helped me to separate these issues." (Powell Ex. 16)  Moreover, even before these incidents, CABVI had approved Shank's extended medical leave through June 1.  Shank testified that she wanted to return earlier, and her doctor had released her to return to work on May 4 without restrictions.

But Kimbrough argues that even if she was mistaken about whether the ADA applied to Shank's situation, she clearly "advocated" on Shank's behalf, which she

contends amounts to ADA-protected activity.  The Court disagrees.  Kimbrough's own notes of the meeting make it clear that she was questioning CABVI's policy that Shank obtain a doctor's statement in order to use her accrued sick time to work a reduced schedule.  Mitchell met with Kimbrough on May 4 to confirm to her and Backscheider that obtaining the physician's statement was consistent with agency leave policies.  And no one at CABVI contested Shank's ability to use her sick leave once she obtained that statement.  Accepting Kimbrough's argument that her discussion with DeHart was protected advocacy would turn any subjective disagreement over internal employer leave policies into ADA-protected activity.  Someone opposing a practice must have a reasonable, good faith basis to believe that the practice in question is unlawful.  See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001), where plaintiff's supervisors joked about sexually-charged statements by a job applicant during a meeting with the plaintiff; her later complaint about her supervisors was held to be an isolated incident, and not protected activity because no reasonable person could find that the incident amounted to sexual harassment.  Moreover, a complaint or a disagreement that is essentially about management decisions is not protected activity.  See, e.g., Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1313 (6th Cir. 1989), where plaintiff was issued a written warning that if his managerial behavior did not improve, he would be demoted or terminated from the company.  About two weeks later, plaintiff wrote a letter to the human resources department, objecting to his supervisor's critique of his performance and stating that the disciplinary charges against him were a result of "ethnocism."  The Sixth Circuit assumed that plaintiff meant "racial discrimination" but held that his vague charge in an internal letter was insufficient to

-23-

constitute opposition to an unlawful employment practice: "Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination." Id. at 1313.  Similarly here, Kimbrough's vocal dissatisfaction with CABVI's leave policies and its enforcement of those policies with respect to Shank's return cannot reasonably be construed to be ADA-protected activity, given the undisputed facts about Shank's situation.

But even if the discussion between DeHart and Kimbrough could be construed in that fashion, Kimbrough argues that she has produced sufficient evidence to show a causal connection between her "advocacy" and the adverse action taken against her. She largely relies on the timeline of events: May 3 through 6 were the series of discussions and emails about Shank's return; May 10 was the meeting between DeHart and Kimbrough.  After that incident (according to Kimbrough), Powell began "digging through her personnel file" to dredge up any mention of misconduct in her employment history; and on June 10 she received the final written warning.  Her termination followed four months later.  She notes that Mitchell admitted that but for the May 10 incident and her final written warning, he would not have terminated Kimbrough solely for her comments at the flu clinic.  She contends that the temporal proximity of these events is sufficient to raise an inference of a causal connection, citing Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555 (6th Cir. 2004), and Shepard v. Good Samaritan Hosp., 2009 U.S. Dist. LEXIS 127405 (S.D. Ohio, Oct. 13, 2009)(Dlott, J.).

The Sixth Circuit has recognized that in some cases, temporal proximity alone may be sufficient to establish the causal link.  Mickey v. Zeidler Tool & Die Co., 516

-24-

F.3d 516, 523-26 (6th Cir. 2008) addressed the required quantum of evidence when a plaintiff relies on temporal proximity:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

Kimbrough received a written final warning on June 10.  But that warning is not an actionable adverse action.  See, e.g., Taylor v. Geithner, 703 F.3d 328, 338 (6th Cir. 2013), finding that two written reprimands warning an employee that further incidents could lead to disciplinary action did not amount to adverse employment actions.  The lapse of time between the May 10 incident with DeHart, and the June 10 meeting in which she received that warning is therefore not relevant.  The relevant time gap is the proximity of the adverse action, her October 14 termination, to the alleged protected activity, which is a gap of five months.

It is true that the Sixth Circuit has noted that a gap of "a matter of months" may be sufficient.  See Gambill v. Duke Energy Corp., 456 Fed. Appx. 578, 589 (6th Cir. 2012)(collecting cases and finding that a two-year gap did not establish a causal link); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007) (three months was sufficient); Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563 (6th Cir. 2004 (three months was sufficient); Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283-284 (6th Cir. 2012)(two-month gap between notice of plaintiff's medical leave and his termination was

sufficient).  And see Vereecke v. Huron Valley School Dist., 609 F.3d 392 (6th Cir.

2010), emphasizing the importance of a case-by-case analysis of the facts:

> In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn.  At this point, our case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference. ... Indeed, we have rarely found a retaliatory motive based only on temporal proximity.  Even in Mickey, where we articulated the principle that temporal proximity could hypothetically be sufficient in a given case, we noted the presence of additional evidence.

Id. at 400-401 (internal citations omitted).

Looking at the totality of the circumstances in this case, Kimbrough's encounter

with DeHart on May 10 was the latest in a series of documented incidents between

Kimbrough and CABVI management and staff, which were cited in the written warning.

There is no evidence, or reasonable inference that arises from the record, that CABVI

subjected Kimbrough to heightened scrutiny or additional documentation of any and all

incidents.  In fact, after the June 10 written warning, there is no evidence of any special

scrutiny or monitoring of Kimbrough prior to the final incidents on October 14.   The

Court concludes that in this case, the proximity between Kimbrough's purported

protected activity and her termination does not support an inference of a causal link

between the two events.

Kimbrough also argues that other CABVI employees with "attitude" problems

were not disciplined or terminated.  None of these employees engaged in protected

activity, and she contends that this disparate treatment is additional evidence of a causal link.  She claims that Gina Carroll behaved "inappropriately" at the same quarterly meetings for which Powell criticized Kimbrough's unprofessional behavior, citing Powell's deposition testimony.  Powell was asked if he remembered anyone other than Kimbrough behaving in an unprofessional way at quarterly staff meetings; he responded:

> A:  Perhaps Gina Carroll.  Other people used the forum to question or ask for clarification, but not –
>
> Q: My question is unprofessional.
>
> A: No.

(Powell Dep. at 110)  In contrast, Powell testified that Kimbrough "engaged in rather combative exchanges in public forums that were not constructive," and gave as an example her conduct at Powell's first quarterly staff meeting.  (Powell Dep. at 87-89)  Powell's testimony cannot fairly be understood to suggest that Kimbrough and Carroll engaged in comparable conduct.

Kimbrough also claims that DeHart had several "run-ins" with Carroll.  But DeHart identified one disagreement he had with Carroll in which she became "very vocal" in disagreeing with DeHart's redrafting of a document she wrote concerning an incident involving one of her employees.  DeHart explained that he found the situation with that employee to be more serious than Carroll's description; he also recalled discussing with Jen DuBois and possibly Backscheider whether or not Carroll's conduct warranted some disciplinary measures.  He ultimately decided that it did not.  Other than this incident, neither Powell nor DeHart identified any instances in which Carroll challenged

agency policies or procedures, or challenged the executive director's decisions with respect to such issues.  DeHart believed that Carroll's interpersonal skills were not strong, and he noted comments in some of her annual reviews about problems with her abrupt tone and negative reaction to situations.  But these few comments and observations are simply not comparable to the record of Kimbrough's reviews and warnings about her interactions not only with fellow employees, but with supervisors, managers, and in at least one case, with an outside nursing home staff member.

Kimbrough also compares her conduct to that of Jeanne Horton, CABVI's accounting supervisor.  She claims that both Powell and DeHart said that Horton complained more about agency employees and management than anyone else at CABVI.  Powell was asked whether Horton had complained to him about anyone; he responded: "I would have certainly heard a complaint about Sue Kimbrough, and she would have complained about Mary McKee and about Nancy Klasemer.  That's all I can remember."  (Powell Dep. at 33)  And the only complaint about Horton he could remember was one conversation with Backscheider, involving an event that both Kimbrough and Horton attended.  Powell said that Backscheider was just "venting" about a disagreement with Horton, and that the situation did not warrant discipline.  (Id. at 36-37)  DeHart recalled that Horton complained to him about Klasemer and Tim Dodds, but he did not say that her conduct was unprofessional, or that she inappropriately confronted either of those supervisors with her complaints.  And Kimbrough notes that a departing employee complained about Horton (along with a number of other CABVI employees) in an exit interview, and described Horton as verbally abusive to her.

Kimbrough also cites incidents involving three other employees (Dobrovic, Thurman, and Braunstein).  Thurman was described as "confrontational with her team." Powell said Thurman was counseled several times for management issues, and she eventually resigned from CABVI.  Braunstein was apparently "sarcastic" with his co-workers; and Powell described Dobrovoic as defensive when Powell would suggest ways to improve his department.

None of these employees have records that are comparable to Kimbrough's.  In order to be valid comparators, the other employees must be "similarly situated."  This does not require that the individuals are "identically situated."  What is required, however, is that Kimbrough demonstrate that she is similarly situated to another employee in **relevant** aspects.  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).  And it is Kimbrough's burden to show that the conduct of these employees was comparably serious to her own.  Kimbrough's personnel file documented repeated instances of open disagreements with agency managers, including Baud and Mitchell, and later with human resources personnel (DeHart and Powell).  She was also cited for an incident involving an outside agency, a nursing home employee, who complained about Kimbrough's treatment.  It is not enough for her to cite other employees who had "run-ins" with colleagues, or who were counseled for job performance issues.  The materials in the record do not, in the Court's view, establish that any of these employees were similarly-situated to Kimbrough, or that they were treated in such a disparate fashion that an inference arises of a causal link between Kimbrough's purported protected activity and her termination.

The Court is firmly convinced that Kimbrough has not established a prima facie

retaliation claim.  For that reason, and in the interest of judicial economy, the Court will

not address the parties' arguments on legitimate justification and pretext.

III.    <u>Ohio Public Policy Claim</u>

Count Five of Kimbrough's complaint alleges that Mitchell terminated her in

violation of Ohio's public policy because she told him that she had a lawyer.  Ohio law

recognizes a common law claim for wrongful discharge in violation of the state's public

policy.  <u>Painter v. Graley</u>, 70 Ohio St.3d 377, 382 (Ohio 1994).  The elements of such a

claim arise entirely under Ohio law, in particular the need to ascertain the state's "clear

public policy."

28 U.S.C. §1367(c) states that the district court may decline to exercise

supplemental jurisdiction over a state law claim if: "(1) the claim raises a novel or

complex issue of State law," or "(3) the district court has dismissed all claims over which

it has original jurisdiction."  Both of these factors apply here; a violation of state public

policy is a evolving and complex issue of Ohio law, and the Court has dismissed all of

Kimbrough's federal claims.  For these reasons, the Court exercises its discretion to

decline jurisdiction over Count 5 of Kimbrough's complaint.  That claim is therefore

dismissed without prejudice.

**CONCLUSION**

For all of the foregoing reasons, Defendant's motion for summary judgment is

granted in part and denied in part.  The motion is granted with respect to Kimbrough's

federal and state age discrimination and ADA-retaliation claims, Counts One through

Four of her complaint.  Those claims are dismissed WITH PREJUDICE.  The motion is

denied with respect to Plaintiff's state law wrongful discharge claim, Count Five, and

that claim is dismissed WITHOUT PREJUDICE.

      SO ORDERED.

      THIS CASE IS CLOSED.

DATED: December 10, 2013          s/Sandra S. Beckwith
                              Sandra S. Beckwith, Senior Judge
                              United States District Court